UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHRISTINE M. SERRATO,

       Plaintiff,

v.                                  Case No. 1:08-CV-780

SHORT TERM DISABILITY INCOME         HON. GORDON J. QUIST
PLAN FOR THE CLASS 46
EMPLOYEES OF LEAR
CORPORATION and LEAR
CORPORATION,

       Defendants.

_____/

## OPINION

      Plaintiff, Christina M. Serrato ("Serrato"), has sued Defendants, Short Term Disability Income Plan for the Class 46 Employees of Lear Corporation (the "Plan") and Lear Corporation ("Lear"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461, for review of Defendants' denial of short-term disability ("STD") benefits. For relief, she seeks an award of the STD benefits she alleges she is owed, plus costs, interest and attorney fees. She initially filed her complaint in the 59th District Court for the State of Michigan, and Defendants removed the case to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

      The parties have filed cross motions for judgment based upon the administrative record pursuant to the procedure set forth in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), for determining ERISA denial of benefits claims.[1] For the reasons set forth below, the

_____

[1]Serrato filed a brief in support of judgment on the Administrative Record but did not file a formal motion. However, the Court will consider her brief as her motion in support of judgment.

Court will grant Serrato's motion, deny Defendants' motion, and enter judgment reversing Defendants' decision to deny STD benefits.

## FACTS AND PROCEDURAL BACKGROUND

During 2007, Serrato was employed by Lear as an "OP Technician," which was classified as a "heavy position." (Agreed Administrative R. ("A.R.") at 78.) Lear sponsored a Short-Term Disability Income Plan which provided STD benefits to its hourly union workers, including Serrato. The Plan provides a maximum of 26 weeks of STD benefits and defines a disability as follows: "You are considered Disabled if, solely because of a covered Injury or Sickness, you are unable to perform all the material duties of your Regular Occupation." (Plan Document ("P.D.") at LC43.)[2] An employee's "Regular Occupation" is:

> The occupation the Employee routinely performs at the time the Disability begins. In evaluating Disability, the Plan will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location.

(*Id.* at LC64.) "Sickness" includes "[a]ny physical or mental illness or disease, including *pregnancy*, a disabling pregnancy-related condition or disability resulting from a voluntary sterilization procedure." (*Id.* (italics added).)

Serrato became pregnant in early 2007 and saw Dr. Peter Kaczkofsky, a board certified obstetrician, for her pregnancy care. On July 23, 2007, in her fifth month of pregnancy, Dr. Kaczkofsky placed the following restrictions on Serrato's work activities: no lifting over 20 lbs; 15 minute breaks every two hours; a half-hour lunch break for every 8-hour shift; and no more than 40 hours per week, 9 hours per day. (A.R. at 10.) When Serrato reported to work later that day, Lear sent her home because of the restrictions.

---

[2] Defendants filed the Plan Document separate from the Agreed Administrative Record because the parties dispute the document that governs Serrato's claim. Defendants contend that the Plan Document controls, while Serrato contends that the Summary Plan Description Controls. For reasons explained in more detail, *infra*, that issue is immaterial.

On July 24, 2007, Serrato made a telephonic claim for STD benefits to CIGNA Group Insurance ("CIGNA"), the Claim Administrator for the Plan.[3]  Serrato reported that she was pregnant; had complications, which she described as work restrictions; and last worked on July 23, 2007. (*Id.* at 4.)  On July 27, 2007, CIGNA sent Serrato a letter stating that it was unable to make a determination based upon the information Serrato had provided and it would be contacting Dr. Kaczkofsky to obtain information regarding her diagnosis and functional abilities.  On August 1, 2007, Serrato spoke to Alan Yeckley, the case manager to whom the claim was assigned. She confirmed her restrictions and told Yeckley that she had a blood clot earlier in her pregnancy and during her previous pregnancy she was at risk for "MR." (*Id.* at 169.)

On August 16, 2007, Yeckley faxed Dr. Kaczkofsky a request for Serrato's medical records. On August 21, Dr. Kaczkofsky's office faxed CIGNA various medical documents from Serrato's file, including the previously-imposed work restrictions and office visit notes reflecting no problems and "no complaints" by Serrato.  On August 22, 2007, Lorie Shaffer, a claims manager, advised Serrato that CIGNA was still unable to make a determination based upon the recent information from Dr. Kaczkofsky.  Shaffer also informed Serrato that a nurse case manager would be following up with Dr. Kaczkofsky to clarify the basis for restrictions and limitations, explaining that CIGNA "need[ed] this information to determine your functional ability, and whether you qualify for benefits as defined under your contract." (*Id.* at 22.)

On August 24, 2007, Mary Jo Kelly, the nurse case manager, sent Dr. Kaczkofsky a fax stating: "We need to determine what complication of pregnancy exists which restricts the patient's

---

[3]Neither the Plan Document nor the Summary Plan Description refers to CIGNA.  The Administrative Services Agreement, appended to the Plan Document, refers to Life Insurance Company of North America ("LICNA").  While many of the documents in the Administrative Record contain the CIGNA name and logo on the top of the letterhead, the correspondences indicate that LICNA administers the Plan and "CIGNA" and "CIGNA Group Insurance" are service marks of CIGNA Corporation that refer to its various operating entities, including LICNA.  Accordingly, the Court will refer to CIGNA and LICNA interchangeably.

activity as of 7-24-07?   What are the exam findings or test results which support theses [sic]

restrictions?"  (*Id.* at 27.)  Dr. Kaczkofsky's office responded to this request on August 29, 2007,

explaining that other than a blood clot early in her pregnancy (which had apparently resolved itself

by that time), Serrato had no complications.  The assistant further advised that the restrictions were

the standard restrictions Dr. Kaczkofsky placed on all his patients.  (*Id.* at 146.)  As of September

5, 2007, Yeckley, noting that the information "fail[ed] to show any complication with pregnancy,

no bleeding, neg[ative] urine tests, no contractions," concluded that the claim should be closed due

to an absence of medical support for the restrictions and limitations.  (*Id.* at 110.)

On October 1, 2007, Yeckley sent Serrato a letter formally denying her claim.  After quoting

the Plan's definition of "Disabled," Yeckley wrote that CIGNA's "records indicated that you are

claiming disability due to symptoms associated with pregnancy complications."  (*Id.* at 32.)  He then

explained the basis for the denial:

> From the information provided from Dr Kacvkofsky [sic] there are no complications
> noted.  Your blood pressure is normal, urine tests are negative, no evidence of
> contractions or bleeding.  These signs and symptoms do not support a diagnosis of
> a complicated pregnancy.
>
> On August 29, 2007 we received a call from Dr. Kacvkofsky's [sic] office.  In this
> conversation it was noted that you were not having any complications.  It was noted
> that the above mentioned limitations and restrictions are placed upon every patient
> in the doctor's office as this is their standard practice.
>
> After review of the medical records submitted and in order to determine if the
> information was interpreted appropriately, your medical information was discussed
> with out [sic] Nurse Care Manager.  The outcome of the review is that the medical
> documentation does not support the restrictions and limitations.
>
> While we are not stating that you do not have a medical condition or we do not
> respect the opinions of your providers, the medical documentation on file does not
> support a level of impairment from performing the duties of your occupation.  In
> order to remain eligible for benefits, the medical documentation must continue to
> support a level of functional impairment which supports you continuing to meet the
> definition of disability as defined by your plan.  Therefore your claim is denied from
> July 24, 2007 through the present.

(*Id.* at 32-33.)

On October 31, 2007, Serrato sent a letter to CIGNA requesting a copy of her STD file and appealing the October 1 denial of benefits. CIGNA acknowledged receipt of Serrato's appeal in a letter dated November 2, 2007, in which CIGNA advised Serrato of her responsibility to provide supporting information by November 23, 2007. (*Id.* at 51.) In response, Serrato submitted a note from Dr. Kaczkofsky stating that he had seen Serrato on November 12, 2007, and her estimated delivery date was December 6, 2007. Dr. Kaczkofsky reiterated the prior restrictions, with the exception that Serrato was limited to working 8 rather than 9 hours per day. (*Id.* at 69.) CIGNA denied the appeal in a letter dated February 6, 2008. Lori Ann Dreyer, an Appeals Claim Manager, wrote that CIGNA's records showed that Serrato stopped working "due to pregnancy complications" and that following a review by the nurse case manager, CIGNA determined "that the medical information on file does not support a condition that would render you disabled." (*Id.* at 82.). Dreyer noted that in light of normal pregnancy indicators, there were no "clinical findings" that would support Dr. Kaczkofsky's restrictions. (*Id.* at 83.) In short, CIGNA concluded that because the pregnancy was normal, there was no support for the restrictions. (*Id.*)

Serrato requested a second appeal on February 27, 2008. As additional support, Serrato provided letter from Dr. Kaczkofsky dated February 21, 2008, which stated:

> Christina Serrato was a patient of mine who I saw from April of 2007 to January of 2008 for pregnancy, delivery, and post partum care. She had stated that her job involved heavy lifting and being on her feet for long periods of time. My recommendations for her and for all my pregnant patients are to have the [] restrictions [previously given] . . . . The patient is able to work she just needed to follow the restrictions. Those restrictions are the normal pregnancy restrictions that are given to all my patients.
> Christina did have some early complications in her pregnancy with bleeding, so following the restrictions closely was definitely recommended. . . .

(*Id.* at 81.) On February 28, 2008, CIGNA informed Serrato that it would only consider a second appeal if "additional relevant medical information" was provided, and because Dr. Kaczkofsky's letter contained no new relevant medical documentation, CIGNA declined to accept her appeal. (*Id.* at 85.) Serrato filed her complaint shortly thereafter.

In January 2008, while Serrato's appeal was pending, Lear announced its decision to close the plant where Serrato worked.  In connection with the closure, Lear offered employees severance benefits in exchange for a release of all claims.  Serrato signed the release, but altered it to exclude her claim for STD benefits.  According to Serrato, Lear accepted the altered release and paid her the severance package.  (Pl.'s Br. for J. at 5 n.3.)  Thus, neither the release nor the plant closure has any bearing on the issues in this case.

**DISCUSSION**

***Standard of Review***

As in every ERISA benefits case, the Court's analysis begins with the proper standard of review.  A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998).  The *de novo* standard of review applies to both the factual determinations and legal conclusions of the plan administrator.  *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998).  Such review is conducted "without deference" to the plan administrator's decision.  *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (2008).

Where the plan clearly confers discretion upon the administrator to determine eligibility or construe the plan's provisions, the determination is reviewed under the "arbitrary and capricious" standard.  *Wells v. United States Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1248 (6th Cir. 1991).  The arbitrary and capricious standard "'is the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'"  *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted) (quoting *Pokratz v. Jones*

6

*Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)); *see also Miller v. Metropolitan Life Ins. Co.*, 925

F.2d 979, 984 (6th Cir. 1991) (noting that administrators' decisions "are not arbitrary and capricious

if they are 'rational in light of the plan's provisions'") (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263,

267 (6th Cir. 1988)).   In applying this standard, the Court must defer to the administrator's

interpretation when the plan vests the administrator with discretion to interpret the plan; an

administrator's determination will be overturned only upon a showing of internal inconsistency in

the plan or bad faith.  *Davis*, 887 F.2d at 695.  While no particular language is necessary to vest the

plan administrator with discretion to interpret the plan or make benefit determinations, the Sixth

Circuit "has consistently required that a plan contain 'a *clear* grant of discretion [to the

administrator] to determine benefits or interpret the plan.'"  *Perez*, 150 F.3d at 555 (quoting *Wulf

v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1993) (italics and alteration in original)).

A court may not, however,  "merely . . . rubber stamp the administrator's decision," but must

actually "exercise [its] review powers."  *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir.

2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  A

plan administrator's conflict of interest does not alter the standard of review, but is a factor that

should be taken into account in determining whether the  decision was arbitrary and capricious.  *See

Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

      The Court concludes, as do the parties, that the Plan's provisions include a sufficiently clear

grant of discretion to the Plan Administrator to invoke the arbitrary and capricious standard of

review.  Among other things, the Plan provides that the Plan Administrator shall have the powers

to "interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons

claiming benefits under the Plan," and "decide all questions concerning the Plan and the eligibility

of any person to participate in the Plan."  (P.D. at LC64.)  The Plan also allows the Plan

Administrator to "allocate and delegate its responsibilities under the Plan and to designate other

persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing." (*Id.* at 65.)

In spite of these provisions, Serrato argues, unpersuasively, for *de novo* review based upon *Edwards v. State Farm Mutual Automobile Insurance Co.*, 851 F.2d 134 (6th Cir. 1988). *Edwards* held that the provisions of a summary plan description, which conflicted with those of the actual plan, controlled on the issue of whether the plaintiff met the plan's eligibility criteria. *See id.* at 136. As the Sixth Circuit has explained,

> The principle underlying our decision in *Edwards*, and the summary plan disclosure obligations contained in ERISA § 1022, is ultimately one of pragmatic fairness. When an employer distributes a document that purports to summarize an employee's benefit information, a lay beneficiary should logically be able to rely on that summary rather than combing through the often nearly incomprehensible plan itself. . . Where an employer fails to satisfy the disclosure obligations contained in section 1022, such that the information contained in a summary plan description is in conflict with that of the plan itself, it is logical that the courts enforce the terms of the summary plan.

*Haus v. Bechtel Jacobs Co.*, 491 F.3d 557, 565 (6th Cir. 2007).

Serrato asserts that the Summary Plan Description ("SPD") controls because it conflicts with the Plan in certain respects. She further contends that the *de novo* standard applies because the SPD identifies Lear as the Plan Administrator but CIGNA, which may be the Claims Administrator under the SPD but does not have discretionary authority to decide claims, made the decision to deny her claim. Her argument fails for several reasons. First, there is no conflict regarding the claims procedure provisions in the two documents, and even if there were, such conflict is irrelevant because Serrato does not assert a procedural violation under ERISA, the Plan, or the SPD.[4] Second, the Plan and the SPD are consistent regarding the identification of the Plan Administrator. The SPD

---

[4]Even if Serrato asserted a procedural violation, to this Court's knowledge, the Sixth Circuit has never held that changing the standard of review is a proper remedy for procedural violations. *See Univ. Hosps. of Cleveland v. South Lorain Merchants Ass'n Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 434 (6th Cir. 2006) (Stating that *VanderKlok v. Provident Life and Accident Insurance Co.*, 956 F.2d 610 (6th Cir. 2992), "does not suggest that changing the standard of review . . . is the proper means of remedying a violation of a claimant's procedural rights").

identifies Lear as the Plan Administrator.  While the Plan does not specifically identify the Plan

Administrator, ERISA supplies this information.   Pursuant to 29 U.S.C. § 1002(16)(A), the

"administrator" is:

> (i) the person specifically so designated by the terms of the instrument under which
> the plan is operated;
> (ii) if an administrator is not so designated, the plan sponsor; or
> (iii) in the case of a plan for which an administrator is not designated and a plan
> sponsor cannot be identified, such other person as the Secretary may by regulation
> prescribe.

Because Lear is the Plan Sponsor, *see* 29 U.S.C. § 1002(16)(B), it is the Plan Administrator by

default.  The fact that the SPD refers to a Claims Administrator, while the Plan does not, is not a

conflict.  Finally, even assuming a conflict, Serrato fails to explain how she relied upon the SPD,

which she received after she administratively exhausted her claim.[5]

On the other hand, Defendants' assertion that the arbitrary and capricious standard applies

does not necessarily prevail.  As noted, Lear is the Plan Administrator, but CIGNA denied the claim.

ERISA provides that a plan document may specify procedures "for named fiduciaries to designate

persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee

responsibilities) under the plan."  29 U.S.C. § 1105(c)(1)(B).  Where the named fiduciary vested

with discretionary authority makes a proper delegation of its fiduciary responsibilities, "then

discretionary review 'applies to the designated ERISA-fiduciary as well as to the named fiduciary.'"

*Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 742 (6th Cir. 2005) (quoting

*Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1284 (9th Cir. 1990)).  While ERISA

requires that the plan document must provide for a delegation of fiduciary responsibilities in order

for a delegation to be valid, it does not specify any particular requirements, such as a writing.  *Id.*

---

[5]Serrato says that she relied upon the SPD in identifying and naming the Defendants in this lawsuit and when
she made decisions regarding her severance package.  But as already noted, the severance package presents no issue here,
nor do Defendants contend that Serrato sued the wrong party or that she failed to exhaust because CIGNA was not the
proper party to decide the claim.

at 1104. Thus, to be valid, the purported delegation need only comply with the plan document. *Id.* at 1105.

As noted above, the Plan provides for such a "delegation or designation to be in writing." (P.D. at LC65.) Defendants contend that the writing requirement is satisfied by the Administrative Services Agreement attached to the Plan document. Defendants may be correct, but only the first two pages of that document are in the record. Section 2, captioned "Performance of Services," states that "[CIGNA] agrees to furnish the services specified in Schedule A in connection with the Plan." (P.D. at LC67.) As Serrato noted in her reply brief, Defendants did not include Schedule A, so the Court is left only to speculate about the particular responsibilities Lear delegated to CIGNA. Although they have had sufficient time to do so, Defendants have not moved to supplement or amend the record to include the missing pages of the Administrative Services Agreement. Accordingly, Defendants have failed to show a proper delegation as required by the Plan document. The Court will therefore conduct a *de novo* review, although it would reach the same result even under the deferential standard.

### Claim for Benefits

The starting point is the Plan's definition of disability: "You are considered Disabled if, solely because of a covered Injury or Sickness, you are unable to perform all the material duties of your Regular Occupation." (P.D. at LC43.) Serrato had a covered "Sickness" because the Plan expressly includes pregnancy as a physical illness constituting "Sickness." (*Id.* at LC64.) The question, therefore, is whether the pregnancy rendered Serrato unable to perform all the material duties of her regular occupation. The simple answer is that it did. Prior to July 23, 2007, Serrato was able to perform all of the duties of her OP Technician position, which was classified as a "heavy position" because it involved lifting heavy amounts of over 60 pounds several times per hour. (A.R. at 69.) She became unable to perform her regular job duties, however, only when Dr. Kaczkofsky

imposed his normal pregnancy restrictions that precluded Serrato from lifting over 20 pounds. The restrictions, imposed because of her pregnancy, rendered Serrato disabled. The Plan requires no more.

CIGNA's denial letters and correspondence with Dr. Kaczkofsky show that it misconstrued either the applicable Plan provisions or the nature of Serrato's claim by its focus on pregnancy-related complications. For example, in its February 6, 2008, denial letter, CIGNA stated that Serrato stopped working "on July 23, 2007 due to pregnancy complications," (*id.* at 82), but that statement is contrary to the record, which shows that Serrato stopped working because her restrictions prevented her from doing her job. Similarly, CIGNA's statement that there was "no mention of complications" in Serrato's medical records, as well as its statement that in order to establish eligibility for STD benefits "we need to establish a condition that precluded you from performing the demands of your occupation," (*id.* at 83), shows that CIGNA misapprehended the plain meaning of the Plan that a pregnancy, without complications, is a condition that can prevent a woman from performing all the material duties of her job. Even under the deferential arbitrary and capricious standard, CIGNA's interpretation would require reversal because a plan administrator abuses its discretion when it adds requirements not dictated by the plan. *See Haus*, 491 F.3d at 564 (finding the plan administrator's application of one plan's eligibility requirements to other plans "absent any text that even remotely supports such a conclusion" to be arbitrary and capricious); *Jones*, 385 F.3d at 661 ("Discretion to interpret a plan . . . does not include the authority to add eligibility requirements to the plan.").

CIGNA makes much of the fact that Serrato's restrictions were the same ones Dr. Kaczkofsky imposes on all of his patients in their fifth month of pregnancy. This is irrelevant; it does not show that the restrictions were medically unnecessary or not consistent with contemporary standards of sound prenatal care. Nor is it a basis under the Plan for denying benefits. In *Evans v.*

*Unumprovident Corp.*, 434 F.3d 866 (6th Cir. 2006), the plaintiff suffered seizures resulting from complex partial epilepsy. The defendant initially found the plaintiff disabled and awarded her long term disability benefits. One of the plaintiff's treating neurologists imposed various restrictions, including avoidance of increased levels of stress, which he cited as a precipitant to seizure activity. Upon further review of the plaintiff's disability status, the defendant's reviewing physician determined the plaintiff's treating neurologist's opinion that the plaintiff could not tolerate stress to be "very prophylactic." For this and other reasons, the defendant determined that the plaintiff was no longer disabled and it terminated her benefits. The Sixth Circuit held that the defendant's decision was arbitrary and capricious. Regarding the stress restriction, the court observed that the defendant's physicians unreasonably discounted the stress restriction as "prophylactic." *Id.* at 879. The court also observed that the district court "accurately noted that so-called 'prophylactic' restrictions are not precluded from consideration in disability determinations under the terms of the LTD policy." *Id.* Here, as in *Evans*, the Plan does not preclude "prophylactic" restrictions from establishing disability.

Defendants argue that nothing in the record supports the conclusion that the restrictions Dr. Kaczkofsky imposed upon Serrato, as he does with all of his patients, were "prophylactic" or "preventative," but this argument is puzzling in light of the record. Dr. Kaczkofsky told CIGNA that the restrictions were the normal pregnancy restrictions, but he especially recommended that Serrato adhere to them in light of complications with bleeding early in her pregnancy. (A.R. at 81.) Similarly, Defendants' contention that Serrato failed to provide objective evidence of a functional limitation seems to be based upon their erroneous belief that something more than a normal pregnancy is required to meet the Plan's definition of disability.[6] In fact, the best evidence that

---

[6]The Plan's broad inclusion of pregnancy as a "Sickness" might even render medical support of a functional limitation unnecessary in certain occupations involving strenuous activity and/or requiring agility because the woman's physical condition alone could be proof that she could not do the job. A coal miner or a construction worker would be

Serrato could not perform her job comes from Lear itself, which apparently sent Serrato home after determining that the restrictions prevented her from doing her job.  (A.R. at 19, 50.)

Likewise, Defendants' citation to *Cooper v. Life Insurance Co. of North America*, 486 F.3d 157 (6th Cir. 2007), for the proposition that a plan administrator is not obligated to accept a treating physician's unsupported opinions is inapposite.  In *Cooper*, the court observed that LICNA properly denied the claimant's initial request for disability benefits, even though it ultimately determined that LICNA's decisions to deny the claimant's first and second administrative appeals were arbitrary and capricious.  *See id.* at 166-70.  Regarding the initial request, the court concluded that LICNA properly denied it because the claimant failed to submit objective medical evidence supporting her functional capacity, even though LICNA had requested such information from the claimant's treating physician.  The court noted that under *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965 (2003), LICNA was not obligated to accept the treating physician's opinion without some objective support.  *See id.* at 167.

This case differs from *Cooper* because here, Serrato was pregnant and, therefore, had an objectively verifiable illness under the Plan.  The pregnancy precluded Serrato performing all her material job duties as a result of the preventative restrictions that Dr. Kaczkofsky imposed.  In other words, while Serrato may have been physically able to do her job for some period of time, she could have continued to work only if she chose to disregard her doctor's instructions.  As explained above, the fact the restrictions were merely preventative is irrelevant because they still precluded Serrato from working.  In fact, Lear itself considered Serrato unable to perform her job because of the pregnancy restrictions.

Based upon Dr. Kaczkofsky's responses to its inquiries, CIGNA (LICNA) knew that the restrictions Dr. Kaczkofsky imposed on Serrato were the standard preventative restrictions he

---

two such examples.

imposed on all of his patients in the fifth month of pregnancy, but it never asked Dr. Kaczkofsky about his reasons for imposing standard restrictions, if it had any reason to suspect they were not medically sound.  Moreover, in contrast to *Cooper*, where it obtained an independent physician's review of the claimant's file, CIGNA did not have the file reviewed by a qualified physician, whether an independent examiner or one of its own, for an opinion about whether the restrictions were medically supportable.

Serrato raises other issues concerning CIGNA's potential conflict of interest and what appears to be an early decision on the claim, indicating a predisposition towards denial of her benefits.  In light of the Court's application of the *de novo* standard of review, as well as its conclusion that CIGNA's denial would be arbitrary and capricious based solely upon its erroneous application of the relevant Plan language, the Court need not address these issues.

## CONCLUSION

For the foregoing reasons, the Court concludes that Serrato has met her burden of demonstrating that she was disabled under the Plan.  Therefore, the Court will enter judgment on the administrative record for Serrato.

An Order and Judgment consistent with this Opinion will be entered.


Date:  March 12, 2009                                          /s/ Gordon J. Quist
                                                                      GORDON J. QUIST
                                                                      UNITED STATES DISTRICT JUDGE